## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

**RITA BENNETT, In Her Representative**                      **PLAINTIFF**
**Capacity as Guardian of BETTY COGGINS**

**VS.**                                        **CIVIL ACTION NO: 1:05cv300-DD**

**BEVERLY ENTERPRISES, INC.,**
**BEVERLY HEALTH AND REHABILITATION**
**SERVICES, INC., BEVERLY HEALTHCARE, INC.,**
**BEVERLY ENTERPRISES MISSISSIPPI, INC.,**
**FILLMORE CAPITAL PARTNERS, LLC,**
**FILLMORE STRATEGIC INVESTORS, LLC,**
**PEARL SENIOR CARE, INC., PSC SUB, INC.,**
**GEARY PROPERTY HOLDING, LLC, COLUMN**
**FINANCIAL, INC., CAPITAL SOURCE FINANCE,**
**LLC, WILLIAM R. FLOYD, DAVID R. DEVEREAUX,**
**and JOHN AND JANE DOES 1-10**                            **DEFENDANTS**

---

### FIRST AMENDED COMPLAINT

### JURY TRIAL DEMANDED

The Plaintiff, Rita Bennett, in her representative capacity as guardian of her mother, Betty Coggins, files this Complaint against Defendants, Beverly Enterprises, Inc., Beverly Health and Rehabilitation Services, Inc., Beverly Healthcare, Inc., Beverly Enterprises Mississippi, Inc., John and Jane Does 1-10, William Floyd, David Devereaux (collectively "Beverly Defendants"), Fillmore Capital Partners, LLC, Pearl Senior Care, Inc., PSC Sub, Inc., Geary Property Holding, LLC, Column Financial, Inc., and Capital Source Finance, LLC as follows:

### I.    INTRODUCTION

1.      This is a Complaint for nursing home abuse and neglect, negligence, gross negligence, reckless disregard for the safety of Betty Coggins and other nursing home residents, failure to supervise, breach of contract, fraudulent concealment, deceit, and

fraudulent conveyance and for recovery of monetary damages for personal injuries sustained by Betty Coggins as a result of the Beverly Defendants.

## II.    PARTIES

2.    Plaintiff, Rita Bennett, is an adult resident citizen of Lee County, Mississippi. Ms. Bennett is the guardian of her elderly mother, Betty Coggins.

3.    Defendant Beverly Enterprises, Inc. ("BEI") is a California corporation with its principal place of business located in Arkansas. BEI may be served with process by serving its registered agent, the C.T. Corporation System located at 631 Lakeland East Drive, Flowood, Mississippi 39208.

4.    Defendant, Beverly Health and Rehabilitation Services, Inc. ("BHRS") is a non-resident corporation with its principal place of business located in Arkansas. BHRS may be served with process by serving its registered agent, CSC PF Rankin County, Inc. located at Mirror Lake Plaza, 2829 Lakeland Drive, Suite 1502, Flowood, Mississippi 39232.

5.    Defendant, Beverly Healthcare, Inc. ("BH") is a non-resident corporation with its principal place of business located in Arkansas. BH may be served with process by serving its registered agent, CSC PF Rankin County, Inc. located at Mirror Lake Plaza, 2829 Lakeland Drive, Suite 1502, Flowood, Mississippi 39232.

6.    Defendant Beverly Enterprises Mississippi, Inc. ("BEM") is a California corporation with is principal place of business located in Arkansas. BEM may be served with process by serving its registered agent, CSC PF Rankin County, Inc. located at Mirror Lake Plaza, 2829 Lakeland Drive, Suite 1502, Flowood, Mississippi 39232.

7.    John and Jane Does 1-10 are unidentified nursing home administrators, directors of nursing, nurses, certified nursing assistants, executives, and other employees or agents of the Beverly Defendants who abused or neglected Betty Coggins, are legally responsible for the abuse and neglect of Betty Coggins under Mississippi law, and/or are responsible for the policies, procedures, and conduct that caused the abuse and neglect of Betty Coggins.

8.    Defendant Fillmore Capital Partners, LLC ("Fillmore Capital") is non-Mississippi limited liability company with its principal place of business located at 140 Pacific Avenue, San Francisco, California 94111. Fillmore Capital may be served with process at the company's headquarters at 140 Pacific Avenue, San Francisco, California 94111.

9.    Defendant Fillmore Strategic Investors, LLC ("Fillmore Strategic") is a non-Mississippi limited liability company that is an affiliate of Fillmore Capital. Fillmore Strategic may be served with process at the company's headquarters at 140 Pacific Avenue, San Francisco, California 94111.

10.    Defendant Pearl Senior Care, Inc. ("PSC") is a Delaware corporation with its principal executive office at Fillmore Capital's offices at 140 Pacific Avenue, San Francisco, California 94111. PSC is a wholly owned indirect subsidiary of Fillmore Capital. PSC may be served with process at 140 Pacific Avenue, San Francisco, California 94111.

11.    Defendant PSC Sub, Inc. is a Delaware corporation with its principal executive office at Fillmore Capital's offices at 140 Pacific Avenue, San Francisco, California 94111. PSC Sub is a wholly owned subsidiary of PSC and an affiliate of

Fillmore Capital. PSC Sub may be served with process at 140 Pacific Avenue, San Francisco, California 94111.

12.     Defendant Geary Property Holding, LLC ("Geary Property") is a non-Mississippi limited liability company that is a wholly owned subsidiary of Fillmore Strategic and an affiliate of Fillmore Capital. Geary Property's principal executive offices are located at Fillmore Capital's offices at 140 Pacific Avenue, San Francisco, California 94111. Geary Property may be served with process at 140 Pacific Avenue, San Francisco, California 94111.

13.     Defendant Column Financial, Inc. is a Delaware corporation registered to do business in Mississippi with its principal place of business located in New York, New York. Column Financial may be served with process by serving its registered agent, Corporation Service Co., 506 South President Street, Jackson, Mississippi 39201.

14.     Defendant Capital Source Finance, LLC is a Delaware limited liability company registered to do business in Mississippi with its principal place of business located in Maryland. Capital Source may be served with process by serving its registered agent, CT Corporation System, 645 Lakeland East Drive Ste 101, Flowood, Mississippi 39232.

15.     Defendant William R. Floyd is an adult resident citizen of the State of Arkansas. Mr. Floyd is the Chairman, Chief Executive Officer, and President of BEI. Mr. Floyd may be served with process at BEI's headquarters in Fort Smith, Arkansas.

16.     Defendant David R. Devereaux is an adult resident citizen of the State of Arkansas. Mr. Devereaux may be served with process at BEI's headquarters in Fort Smith, Arkansas.

### III.    JURISDICTION AND VENUE

17.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332, since the matter in controversy exceeds $75,000.00 and is between citizens of different states.

18.    Venue is proper in the Eastern Division since the abuse and neglect of Betty Coggins occurred in Tupelo, Mississippi.

### IV.    ATTORNEY CERTIFICATE

19.    Pursuant to Mississippi Code Annotated § 11-1-58(4), the undersigned counsel has requested Betty Coggins' records from the Beverly Defendants, but the records were not produced before suit was filed.  The Plaintiff will file a certificate of consultation with an expert witness within ninety (90) days after the records were produced.  The undersigned has concluded on the basis of his own investigation that there is a reasonable basis for the commencement of this action.

20.    On September 16, 2005, Plaintiff delivered her Notice of Claim by certified mail to David R. Devereaux, One Thousand Beverly Way, Fort Smith, Arkansas pursuant to Mississippi Code Annotated § 15-1-36, which requires that sixty (60) days notice of intent to file suit be given.[1]  The Defendants did not respond to the Notice of Claim.

### V.    FACTS

#### A.    THE BEVERLY DEFENDANTS

21.    BEI is one of the largest operators of long term care facilities in the nation.  BEI is headquartered in Fort Smith, Arkansas.  The chief executive officer of BEI is paid

---

[1] See Exhibit "A", a copy of the Notice of Claim letter and return receipts.

over $2 million annually and owns over $10 million worth of stock in the company. Other BEI executives are paid in excess of $700,000.00 annually and own company stock worth millions of dollars.

22. BEI operates nursing homes through its wholly owned subsidiaries and affiliates.

23. BEI also owns and operates a wholly-owned subsidiary called Aegis that provides physical therapy to residents of Beverly Healthcare nursing homes who are eligible for Medicare reimbursement. Aegis performs almost no therapy on non-Medicare eligible residents of Beverly nursing homes because BEI has determined that it would not generate sufficient profits.

24. Beverly Healthcare or Beverly Health and Rehabilitation Services operate nursing homes in Mississippi through its wholly-owned subsidiary BEM. BEM currently operates at least nine (9) nursing homes in Mississippi, including, Beverly Healthcare Eason.

25. All BEM nursing homes, including Beverly Healthcare Eason, are operated in accordance with detailed budgets issued by BEI. The budgets dictate permissible expenditures in all areas of operation including direct hands-on nursing care of residents.

26. Budgets for individual nursing homes flow down the corporate chain from BEI to the individual facilities. As a result, the budgets do not factor in the individual needs of residents at a particular facility such as Beverly Healthcare Eason.

27. The personnel in charge of resident health at Beverly nursing homes are the Directors of Nursing. BEI does not consult with Directors of Nursing at individual

6

facilities before issuing budgets and Directors of Nursing have no input in the amount budgeted for nursing staffing.

28.     BEI defends its budgeting process with respect to staffing levels by allowing individual nursing home Administrators and Directors of Nursing to request additional staff. However, BEI discourages such requests and has implemented a bonus policy that encourages facilities to understaff nursing care and not request additional staff, as discussed in Section C below.

## B.     BEVERLY AND UNDERSTAFFING

29.     Costs associated with paying employees are the largest expenses in operating a nursing home. In addition, the nursing staff – including nursing assistants – represents the majority of all staff within a nursing home.

30.     Federal regulations require nursing homes to provide sufficient staffing to meet the needs of residents.

31.     Mississippi state regulations require nursing homes to provide a minimum of 2.8 hours of direct hands-on nursing care per patient per day.

32.     Together, both state and federal regulations require a minimum of 2.8 hours of hands-on nursing care per patient per day or whatever greater amount is actually necessary to meet the needs of residents in a nursing home facility.

33.     The Beverly Defendants intentionally and systematically fails to provide adequate staffing in its nursing home facilities in order to lower labor expenses and maximize corporate profits.

34. The Beverly Defendants understaff their facilities despite the fact that employees in the facilities regularly complain about understaffing and request that additional staff be provided.

35. Understaffing in Beverly nursing home facilities directly causes residents to be abused, neglected, and provided with inadequate care.

## C. BEVERLY'S BONUS PROGRAM

36. The Beverly Defendants have implemented and maintain a bonus program tracked by a document known as the "Beverly Scorecard".

37. Under the Beverly bonus program as tracked by the Beverly Scorecard, the individual facility Administrators and Directors of Nursing are eligible for bonuses. The bonus program awards bonuses to Administrators and Directors of Nursing whose facilities meet the budget. Further, the bonus program contains a scale so that the more a facility undercuts its budget the greater the Administrator and Director of Nursing's bonuses are.

38. The bonus program also contains a component that implicitly discourages Administrators and Directors of Nursing from reporting accidents, injuries, pressure sores, and other resident conditions usually caused by inadequate care. Inclusion of this component in the bonus program makes it less likely that reportable violations are disclosed to federal and state authorities.

39. Beverly self labels the Beverly Scorecards as "quality assurance" documents that are not subject to production to residents or families of residents of Beverly facilities. As a result, the Beverly bonus program is kept secret.

### D. THE BEVERLY CORPORATE INTEGRITY AGREEMENT

40.    Over the course of many years, BEI and its subsidiaries defrauded millions of dollars from the federal government by submitting false Medicare claims.

41.    As a result, in 2000 BEI settled a Medicare fraud case with the United States Department of Justice and agreed to pay a $175 million settlement and a $5 million fine to resolve civil and criminal charges that it defrauded Medicare.

42.    As a part of BEI's settlement with the federal government, it entered into a Corporate Integrity Agreement with the office of the Inspector General of the United States Department of Health and Human Services to insure compliance by BEI and all of its subsidiaries, affiliates, officers, directors, and employees with the requirements of Medicare, Medicaid, and all other federal health care programs as defined in 42 U.S.C. § 1320A – 7b(f).[2]

43.    As part of the Corporate Integrity Agreement, the Beverly Defendants agreed to insure that its nursing homes complied with all federal regulations, including the regulations under the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), 42 C.F.R. Parts 442 and 483.

44.    These OBRA regulations impose numerous requirements on the Beverly Defendants in their resident care including, but not limited to, requirements regarding the following:

(a)    Reporting resident injuries of unknown origin to state authorities;

(b)    Resident assessment and care planning;

(c)    Nutrition;

(d)    Diabetes and wound care;

---

[2] A copy of the BEI Corporate Integrity Agreement is attached as Exhibit "B".

(e)     Infection control;

(f)     Abuse and neglect policies and reporting procedures;

(g)     Staffing;

(h)     Appropriate drug therapies;

(i)     Appropriate mental health services;

(j)     Provision of basic care needs;

(k)     Incontinence care;

(l)     Resident rights and restraint use;

(m)     Activities of daily living ("ADL") care;

(n)     Therapy services;

(o)     Quality of life, including accommodation of needs and activities; and

(p)     Assessment of patient competence to make treatment decisions.

45.     When the Corporate Integrity Agreement was executed, current and future residents of Beverly facilities were third-party beneficiaries of the Corporate Integrity Agreement.

46.     The Corporate Integrity Agreement imposed a duty on BEI and all Beverly Defendants to comply with and insure compliance with all OBRA regulations with respect to Mrs. Coggins and other residents of all Beverly facilities.

47.     Effective April 19, 2004, the OIG and Beverly Defendants executed an amendment to the Beverly Corporate Integrity Agreement. Among other things the 2004 amendment requires the Beverly Defendants to:

     a.     Implement measures designed to ensure that facility staffing needs are decided "first and foremost" upon achieving the level of care for Beverly's

patients and residents required by federal and state laws, including, but not limited to, 42 CFR § 483.30;

b.   Implement measures designed to inform employees of the staffing requirements of federal and state laws; and

c.   Implement measures to inform employees that staffing levels are a critical aspect of patient and resident care and educating employees about where to report concerns about staffing.

48.   The 2004 Amendment also contained a provision that attempted to disclaim a private right of action based on a violation of the Corporate Integrity Agreement and stated that the residents of Beverly facilities were not intended or third-party beneficiaries of the Corporate Integrity Agreement.

49.   Residents of Beverly facilities, including the Plaintiff, are in fact intended and/or third-party beneficiaries of the Corporate Integrity Agreement.  The provision that attempts to disclaim the status and rights of Beverly facility residents is unconscionable and void as against public policy.

### E.   BETTY COGGINS

50.   Betty Coggins is sixty-eight (68) years old.  Mrs. Coggins is a widow and has three (3) adult children.

51.   In 1994, Mrs. Coggins suffered a stroke that left her partially paralyzed on her right side.  Mrs. Coggins' stroke left her in a condition that required full time care and supervision.  Mrs. Coggins three children were not in a position to provide constant care because they all worked full time.  Mrs. Coggins children also could not afford private home care.

11

52. As a result, Mrs. Coggins children had to place Mrs. Coggins in a nursing home and placed Mrs. Coggins in the Beverly Healthcare Eason nursing home ("the Facility") in 1994.

53. During the entire time period that Mrs. Coggins was a resident of the Facility, a foul odor was constantly present. The odor smelled like urine and feces. Plaintiff and Mrs. Coggins' other children did not know that it was not normal or acceptable for a nursing home to constantly smell like urine and feces.

54. The constant foul odor in the Facility was caused by the systematic neglect of residents in the Facility by the Beverly Defendants and their employees and agents as a direct result of understaffing. Beverly did not staff the Facility with enough nurses and certified nursing assistants to meet the residents' bowel and bladder needs. As a result, incontinent residents who had urinated or defecated in a diaper were not cleaned or their diapers changed in a timely fashion. The sullied linens and bed pads were also not cleaned and replaced in a timely fashion which further contributed to the foul odor of the Facility.

55. In addition, many residents at the Facility were originally continent — meaning that they were able to use the toilet – but needed assistance in getting to and from the toilet. Beverly's understaffing at the Facility resulted in there not being sufficient staff levels for the nursing assistants to be able to assist residents to and from the toilet. As a result, residents became incontinent who otherwise would not have if not for the understaffing at the Facility.

56. In 2004, conditions at the Facility that were bad to begin with significantly deteriorated causing harm to Mrs. Coggins.

## E.    BED SORES

57.    Pressure sores are a painful skin condition which can also be referred to as pressure ulcers and bed sores.  Pressure sores are often caused or made worse by individuals having to lie in urine and feces for unacceptable lengths of time and individuals not being turned often enough.

58.    As a result of the understaffing at the Facility, Mrs. Coggins was not kept cleaned and turned enough to prevent pressure sores.

59.    Mrs. Coggins developed painful pressure sores that required hospital treatment.  On one occasion, the emergency room doctor at the hospital treated Mrs. Coggins pressure sores, applied bandages, and dated the bandages.

60.    After Mrs. Coggins returned to the Facility from the hospital, her children repeatedly asked the Facility's nurses to change Mrs. Coggins' bandages daily pursuant to doctor's orders.

61.    Despite the doctor's orders and multiple requests by Mrs. Coggins' children, the Facility's nursing staff did not change her bandages for over a week.  After more than a week following the hospitalization, the bandages from the hospital had rotted into Mrs. Coggins' body with the date written by the hospital doctor still visible.

62.    The neglect that caused and exacerbated Mrs. Coggins' pressure sores constituted both neglect and abuse under Mississippi law and caused Mrs. Coggins to endure severe physical and mental pain and suffering.

## G.    SCABIES / LICE

63.    Scabies is a contagious skin disorder caused by a very small wingless insect that burrows into the skin and lays one to three eggs daily.  Scabies is a form of

13

lice. Scabies infestation can spread by skin to skin contact or by sharing of clothing, towels, and bedding. Scabies causes intense itching and is painful.

64. Mrs. Coggins contracted a severe infestation of scabies in the Facility that was neglected by the nursing staff and was not treated or diagnosed for over one (1) month.

65. Mrs. Coggins' scabies was diagnosed and treated only after repeated requests were made to the Beverly Defendants by Mrs. Coggins' children for a skin test.

66. Mrs. Coggins endured severe physical pain and suffering and mental anguish as a result of the scabies and her condition was worse than it otherwise would have been because her paralysis prevented her from scratching when she itched. Mrs. Coggins was also permanently scarred from the scabies infestation.

### H.   GENERAL NEGLECT AND ABUSE

67. The Beverly Defendants abused and neglected Mrs. Coggins by not bathing her on a regular basis and not keeping her clean.

68. Employees at the Facility refused requests to bathe Mrs. Coggins on multiple occasions.

69. Mrs. Coggins' nurses' aides at the Facility constantly complained to Mrs. Coggins' family members about the understaffed conditions at the Facility and blamed the understaffing as the reason that the staff did not regularly bathe Mrs. Coggins and keep her clean.

70. Due to Mrs. Coggins' physical condition, she had to be hand fed in order to eat.

14

71.     During the last six (6) months of Mrs. Coggins' residency at the Facility, she lost sixty to seventy (60-70) pounds because the employees at the Facility did not feed her. The failure to feed Mrs. Coggins was caused by understaffing.

72.     Mrs. Coggins' weight loss was caused by at least two (2) factors: (1) the Facility ran out of food and medical supplies on at least one occasion and the food served was not nutritious; and (2) the Facility employees did not feed Mrs. Coggins.

73.     Beverly Defendants took actions to attempt to conceal the resident abuse and neglect taking place at the Facility. For instance, Defendants posted "no cameras" signs at the Facility in an attempt to prevent family members from documenting resident abuse and neglect.

74.     Despite Beverly Defendants' attempt to conceal resident abuse and neglect, Mrs. Coggins' family members photographed her bed sores, scabies, and other painful conditions caused by abuse and neglect.

75.     Beverly Defendants failed to properly care for Mrs. Coggins despite numerous complaints and requests from Mrs. Coggins' family members.

76.     Mrs. Coggins' family members complained to nurses, nursing directors, administrators, and managerial employees from BEI and/or Beverly Healthcare. One Beverly official from Arkansas who was visiting the Facility refused to view the photographs of Mrs. Coggins' condition and diverted his eyes away from the photographs when they were placed on a table in front of him.

77.     At the end of Mrs. Coggins' residency at the Facility, the neglect and abuse increased after Mrs. Coggins' family complained about the inadequate care she

was receiving. Facility personnel refused to feed and bathe Mrs. Coggins in retaliation for the complaints made by her family members.

78.     Mrs. Coggins' family also complained to the office of the Attorney General for the State of Mississippi.

## I.     THE BEVERLY FRAUDULENT CONVEYANCE

79.     On February 14, 2006, BEI's shareholders approved the merger of BEI with PSC and/or PSC Sub. PSC and PSC Sub are entities that were formed solely for the purpose of entering into the merger agreement with BEI and consummating the transactions contemplated by the merger agreement.

80.     Under the terms of the merger, BEI will be the name of the surviving entity, although its ownership and structure will be completely different than it was before the acquisition.

81.     The merger of BEI and PSC is a complex business transaction pursuant to which Fillmore Capital and entities that it controls acquire BEI and it subsidiaries by purchasing all BEI stock from its shareholders for $12.50 per share.

82.     Under the terms of the BEI acquisition, Fillmore Capital and Fillmore Strategic provided PSC with a $350 million equity commitment letter to partially finance the transaction. The remainder of the transaction was financed by $1.875 billion in debt financing provided by Column Financial, Inc. and Capital Source Financial, LLC.

83.     Geary Property is an entity that was created in connection with the BEI acquisition. Under the terms of the acquisition, Geary Property will own BEI's real estate and other assets. The purpose of Geary Property owning the real estate and other assets of

16

BEI is to prevent creditors from seizing the real estate and other assets in order to to satisfy judgments.

84. The BEI acquisition was structured as a "leveraged buyout." A leveraged buyout is a going-private transaction of a public company involving a tender offer for all of the company's common stock, financed mostly by debt. Leveraged buyouts are often harmful to the company's suppliers and customers. A leveraged buyout has the potential to be particularly harmful in the nursing home arena because the "customers" are in fact vulnerable elderly individuals who are not in a position to assert their rights against the company.

85. In the BEI leveraged buyout the assets of one or more of the BEI entities were sold and leased back and/or used as collateral to secure loans, the proceeds of all of which, in whole or in part, were paid to former shareholders of BEI on behalf of Fillmore Capital or its affiliates.

86. At the time of the payment to BEI shareholders, such payment was paid or the related acquisition financing or other indebtedness was incurred with the intent of hindering, delaying or defrauding current and future creditors of BEI, including the Plaintiff. In addition, the Defendants received less than the a reasonably equivalent value or fair consideration for incurring the related acquisition financing and other related indebtedness and one or more of the Defendants were insolvent or were rendered insolvent by reason of the leveraged buyout transaction. The Defendants engaged in a business or transaction for which the assets constituted unreasonably small capital or the Defendants intended to incur, or believed that they would incur, debts beyond their ability to pay as they matured.

87. As a result of the leveraged buyout transaction the Beverly Defendants will be unable to pay their debts as they mature to creditors like the Plaintiff and others similarly situated.

88. The acquisition of BEI by Fillmore Capital and its affiliates is modeled after the recent acquisition of Mariner Health Care, Inc. by National Senior Care, Inc. Fillmore Capital was involved in and an investor in the Mariner Health Care acquisition.

89. After acquiring Mariner Health Care the entities involved in the acquisition drained Mariner of virtually all the company's assets in order to re-pay the creditors that financed the transaction and shield Mariner from having to satisfy its debts to current and future creditors, including its nursing home residents who were victims of abuse and neglect in Mariner nursing homes.

90. Following the transaction Mariner stopped paying its creditors' bills and the unpaid obligations held by creditors amounted to multi-millions of dollars. In Mississippi alone, Mariner failed to pay over $1 million to law firms who were defending the company in civil actions pending in the State of Mississippi.

91. One of the primary objectives of both the Mariner and Beverly acquisitions was to make the companies "judgment proof" from residents of their nursing homes who were victims or abuse and neglect.

92. Other victims of the fraudulent conveyance will be other Beverly creditors such as suppliers of medical supplies and food at Beverly nursing homes and law firms who perform legal work for Beverly in Mississippi.

93. Due to the fraudulent nature and nefarious purpose of the BEI acquisition the acquisition creates the possibility of future criminal and civil liability for BEI's

officers, including Defendants William Floyd and David Devereaux. Floyd and Devereaux were, among other things, the architects of the Beverly operating system including the bonus program.

94.    In order to facilitate the acquisition BEI, Fillmore Capital and the other Defendants agreed to provide liability insurance for Floyd and Devereaux and defend and indemnify them against any expenses or losses incurred in connection with any claim, action, suit, proceeding or investigation arising out of or pertaining to matters pending, existing or occurring at or prior to the merger.

95.    In addition, to facilitate the acquisition Floyd and Devereaux received payments that exceeded $10 million for Floyd and $5 million for Devereaux.

## VI.    CLAIMS FOR RELIEF

### A.    NEGLECT

96.    As a resident of the facility, the Beverly Defendants owed Mrs. Coggins a duty to exercise reasonable care to prevent neglect of Mrs. Coggins while she was a resident of the Facility.

97.    Neglect includes the failure of a caretaker to supply a vulnerable adult with the food, clothing, shelter, healthcare, supervision, or other services that were necessary to maintain her mental and physical health.

98.    Beverly Defendants repeatedly neglected Mrs. Coggins in violation of Mississippi law.

99.    The Beverly Defendants' neglect of Mrs. Coggins caused her to suffer damages.

100. The Beverly Defendants' neglect of Mrs. Coggins was willful or wanton conduct in reckless disregard of the safety of Mrs. Coggins and justifies an award of punitive damages against Beverly Defendants.

**B. ABUSE**

101. As a resident of the Facility, the Beverly Defendants owed Mrs. Coggins a duty to exercise reasonable care to prevent the occurrence of and to protect Mrs. Coggins from abuse while she was a resident in the Facility.

102. Abuse includes the willful infliction of physical pain, injury, or mental anguish on a vulnerable adult, the unreasonable confinement of a vulnerable adult, or the willful deprivation by a caretaker of services that are necessary to maintain the mental and physical health of a vulnerable adult.

103. Beverly Defendants abused Mrs. Coggins in violation of Mississippi law.

104. The Beverly Defendants' abuse of Mrs. Coggins caused her to suffer damages.

105. The Beverly Defendants' abuse of Mrs. Coggins was willful or wanton conduct in reckless disregard for the safety of Mrs. Coggins and justifies an award of punitive damages against Beverly Defendants.

**C. BREACH OF CONTRACT – DIRECT CONTRACT CLAIM**

106. In connection with Mrs. Coggins' admittance to the facility and continued residency at the Facility, the Beverly Defendants agreed to provide her with good care that complied with all federal and state regulations and laws regarding operating a nursing home and the treatment of nursing home residents, including agreeing to adequately staff the Facility in order to meet the residents' needs.

107. By repeatedly neglecting and abusing Mrs. Coggins, the Beverly Defendants breached their contract with Mrs. Coggins, her representatives, and any entities that reimbursed Beverly for caring for Mrs. Coggins, including, Medicare and Medicaid.

108. Plaintiff should be awarded damages in an amount equal to all sums paid to the Beverly Defendants or any other BEI subsidiary for the care and treatment of Mrs. Coggins.

### D.    BREACH OF CONTRACT – THIRD PARTY AND INTENDED BENEFICIARY CLAIMS

109. Mrs. Coggins was an intended and a third-party beneficiary of the Beverly Corporate Integrity Agreement.

110. All Beverly Defendants breached their duty under the Corporate Integrity Agreement to provide care to Mrs. Coggins that complied with all applicable federal regulations including, 42 C. F. R. § 483.

111. The care and treatment provided to Mrs. Coggins did not comply with federal regulations.

112. The Beverly Defendants are liable to Mrs. Coggins in her capacity as a third-party beneficiary of the Corporate Integrity Agreement for actual and sustained damages as a result of the Facility's failure to comply with federal regulations in regard to her care.

113. A judgment should be entered and damages assessed against all Beverly Defendants for breaching the Corporate Integrity Agreement in an amount sufficient to compensate Mrs. Coggins for her physical pain and suffering and mental anguish that resulted from the Beverly Defendants' conduct.

114.    In addition, Beverly Defendants' breaches included conduct that was willful, wanton, or in reckless disregard for the safety of Mrs. Coggins and justifies an award of punitive damages.

## E.    FAILURE TO SUPERVISE

115.    The Beverly Defendants had a duty to supervise the employees at the Facility in a manner that assured that Mrs. Coggins was given adequate care and treatment and not neglected.

116.    The Beverly Defendants breached their duty to Mrs. Coggins by failing to properly and adequately educate, train, and supervise their personnel at the Facility who should have been providing care to Mrs. Coggins.

## F.    GROSS NEGLIGENCE

117.    The Beverly Defendants are liable for all negligent acts and omissions committed by their employees and agents who provided care or were supposed to provide care to Mrs. Coggins.

118.    Beverly Defendants' employees and agents were grossly negligent in their care of Mrs. Coggins.

119.    Beverly Defendants' employees and agents were also grossly negligent in failing to provide Mrs. Coggins with adequate care and treatment.

120.    The Beverly Defendants were grossly negligent with respect to Mrs. Coggins in the following respects:

(a)    Failure to inform Mrs. Coggins' family members and treating physicians of accidents, injuries, and/or significant changes in her condition;

(b)    Failure to investigate and properly resolve grievances reported by Mrs. Coggins' family members, including allegations of abuse and neglect;

22

(c)    Failure to keep Mrs. Coggins free from unreasonable chemical restraints;

(d)    Failure to develop and implement written policies and procedures that prohibit mistreatment, neglect, and abuse of residents;

(e)    Permitting Mrs. Coggins to be abused and neglected while in the Facility;

(f)    Failure to provide care to Mrs. Coggins in a manner and in an environment that maintained her dignity and self respect;

(g)    Failure to develop and implement a proper comprehensive care plan for Mrs. Coggins;

(h)    Failure to provide Mrs. Coggins with the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being in accordance with a comprehensive assessment and plan of care;

(i)    Failure to keep Mrs. Coggins clean and groomed;

(j)    Failure to take adequate measures to prevent or treat pressure sores;

(k)    Failure to provide adequate incontinence care;

(l)    Failure to prevent contractures;

(m)    Failure to prevent severe weight loss;

(n)    Failure to provide adequate nutrition;

(o)    Failure to provide adequate nursing care;

(p)    Failure to adequately staff the Facility;

(q)    Failure to adequately supervise the staff at the Facility;

(r)    Failure to establish and maintain an infection control program that provided a safe, sanitary, and comfortable environment and that prevented the development and transmission of disease and infection, including pressure sores and scabies / lice and;

(s)    Failure to provide adequate administration and management of the facility.

121.    Judgment should be entered against all Beverly Defendants and damages awarded to Plaintiff in an amount adequate to compensate Mrs. Coggins for her physical

pain and suffering and mental anguish caused by the gross negligence of Beverly Defendants' employees and agents.

### G. FRAUDULENT CONCEALMENT AND DECEIT

122. The Beverly Defendants had a duty under federal and state regulations and the Corporate Integrity Agreement to report to federal and state authorities all violations of federal and state regulations and the Corporate Integrity Agreement in the care and treatment of residents of its nursing home facilities.

123. The Beverly Defendants committed multiple acts and omissions that violated federal and state regulations and the Corporate Integrity Agreement in their care and treatment of Mrs. Coggins and other residents at their nursing home facilities.

124. The Beverly Defendants did not self-report any of their violations of federal and state regulations and the Corporate Integrity Agreement in treating Mrs. Coggins and other residents of their nursing home facilities.

125. The Beverly Defendants' failure to self-report violations of federal and state regulations and the Corporate Integrity Agreement constitutes the torts of fraudulent concealment and deceit.

126. The Beverly Defendants also take actions to conceal their poor resident care from state survey inspectors. This conduct prevents Beverly from being cited for inadequate care, prevents the violations in the standard of care from being discovered, and harms the residents including Mrs. Coggins.

127. The Beverly Defendants knew while Mrs. Coggins was a resident of the Facility that the Facility was not staffed adequately to meet the needs of Mrs. Coggins and other residents. The Beverly Defendants intentionally concealed the fact that the

24

Facility was inadequately staffed for the pecuniary benefit of Beverly Defendants in reckless disregard for the safety of Mrs. Coggins and other residents of the Facility.

128. Actions taken by the Beverly Defendants to fraudulently conceal the understaffing at the Facility included maintaining multiple sets of employee work schedules including schedules listing former employees as being scheduled to work. These actions were intended to trick state inspectors into concluding, based on the bogus schedules, that the Facility maintained staffing levels that complied with state and federal regulations.

129. Mrs. Coggins suffered damages as a result of the Beverly Defendants' fraudulent concealment and deceit and judgment should be entered against the Beverly Defendants and Plaintiff awarded actual and punitive damages for the Beverly Defendants' fraudulent concealment and deceit.

## H.   CIVIL CONSPIRACY

130. There existed a conspiracy among the Beverly Defendants and executives and officers of BEI including Floyd and Devereaux, Beverly Healthcare, and other Beverly subsidiaries and affiliates to conceal understaffing, neglect, abuse, and other mistreatment of residents of Beverly nursing home facilities and its violations of federal and state regulations and the Corporate Integrity Agreement in providing care and treatment to residents of Beverly's nursing home facilities.

131. The Beverly Defendants' civil conspiracy was motivated by corporate and individual greed.

25

132.     The Beverly Defendants committed multiple acts of fraud in furtherance of their civil conspiracy including failing to report violations of federal and state regulations and the Corporate Integrity Agreement.

133.     There was also a separate civil conspiracy by and among the Beverly Defendants, Fillmore Capital and its affiliate Defendants, Column Financial and Capital Source Finance involving the BEI leveraged buyout.

134.     The BEI leveraged buyout conspiracy involved an understanding among the Defendants that Column Financial and Capital Source Finance would provide the majority of the financing for the transaction and Fillmore Capital and its affiliates would operate the new company. Floyd, Devereaux and the other BEI officers and directors received significant monetary benefits for backing the buyout in the form of compensation, share redemption and other benefits from BEI.

135.     All Defendants knew that once the leveraged-buyout was complete Fillmore Capital planned to operate the Facility and other Beverly facilities in a manner that is detrimental to the health of the facilities' residents. Fillmore Capital also planned to under-insure the facilities and transfer all assets not used to finance the buyout to Geary Property. Fillmore Capital's intent, as known and agreed to by all Defendants, was to make BEI and its subsidiaries judgment proof from creditors and residents such as Mrs. Coggins who were victims of abuse and neglect in Beverly facilities.

136.     All Defendants knew that by transferring company assets to Geary Property and under-insuring the facilities would allow BEI to operate the facilities in a manner that was not in the best interest of the health and safety of the residents.

26

137. In furtherance of the conspiracy Fillmore Capital and its affiliates agreed to defend and indemnify Floyd and Devereaux in future legal proceedings in order to shield them from individual civil liability based on their actions as officers of BEI including their actions with respect to the leveraged-buyout of BEI.

138. Fillmore Capital and its affiliates, Floyd, Devereaux, Column Financial and Capital Source Finance all profited from the civil conspiracy at the expense of Beverly's residents, which is why they agreed to participate in the conspiracy.

139. Both conspiracies harmed Mrs. Coggins and other residents of Beverly facilities.

## I. FRAUDULENT CONVEYANCE

140. As a result of the Defendants' civil conspiracy and the complex and leveraged buyout of BEI by Fillmore Capital and its affiliates, BEI is and will be unable to pay its debts as they mature to current and future creditors like the Plaintiff.

141. The transactions resulting in the leveraged buyout of the BEI are void as a fraudulent conveyance.

142. The individuals and entities that benefited from the transactions, namely Floyd, Devereaux, Column Financial and Capital Source Finance should be required to return the benefits that they received in the transactions to BEI for the benefit of the creditors of BEI.

143. Mrs. Coggins suffered damages as a result of the fraudulent conveyance and is entitled to an award of actual and punitive damages.

## VII. RELIEF DEMANDED

144. Plaintiff requests economic damages against Beverly Defendants in an amount equal to all sums collected by Beverly Defendants or any of their subsidiaries to provide care or treatment to Mrs. Coggins, with interest.

145. Plaintiff requests damages for physical pain and suffering and mental anguish against Beverly Defendants in an amount not less than $500,000.00.

146. Plaintiff requests punitive damages against Beverly Defendants for their willful or wanton conduct in reckless disregard for the safety of Mrs. Coggins and other residents and gross negligence in an amount not less than $3,750,000.00.

147. Plaintiff requests that the Court declare that the Beverly acquisition is void as a fraudulent conveyance and that the individuals and entities found to have benefited from the transaction be ordered to return the benefits of the transaction to BEI or that BEI be ordered to post a bond or take other actions that will ensure that the Defendants have the ability to satisfy Plaintiff's judgment in this action.

148. Plaintiff requests any other actual, compensatory, consequential, incidental, and punitive damages to which she is entitled to recover under Mississippi law.

149. Plaintiff requests attorneys' fees, costs, expenses, pre-judgment and post-judgment interest allowed by law.

150. Plaintiff requests other relief deemed appropriate by the Court.


This the _____ day of _____, 2006.

Respectfully Submitted,

RITA BENNETT, In Her Representative
Capacity as Guardian of BETTY COGGINS

By Her Attorneys:


John D. Giddens
JOHN D. GIDDENS
MS Bar No.:9357

Philip W. Thomas, Esq.                     John D. Giddens, Esq.
PHILIP W. THOMAS, P.A.                     GIDDENS LAW FIRM
747 North Congress Street                  226 North President Street
Jackson, Mississippi 39202                 Jackson, Mississippi 39236
Post Office Box 24464                      Post Office Box 22546
Jackson, Mississippi 39225-4464            Jackson, Mississippi 39225-2546
Tel: (601) 714-5660                        Tel: (601) 355-2022
Fax: (601) 714-5659                        Fax: (601) 355-0012

Pieter Teeuwissen, Esq.
PIETER TEEUWISSEN, ESQ., PLLC
Post Office Box 16787
Jackson, Mississippi 39236
Tel:  (601) 420-1188
Fax: (601) 982-0190

## CERTIFICATE OF SERVICE

I, John D. Giddens, do hereby certify that on March 21, 2006, I electronically filed First Amended Complaint   with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Jason Miller, Esq., Charles Potts, Esq. of Alford, Clausen & McDonald, LLC One St. Louis Center, Suite 5000, Mobile, Alabama 36602.

Respectfully submitted,
S/John D. Giddens
JOHN D. GIDDENS

John D. Giddens, Esq.
GIDDENS LAW FIRM
226 North President Street
Jackson, Mississippi 39201
Post Office Box 22546
Jackson, Mississippi 39225-4464
Tel: (601) 355-2022
Fax: (601) 355-0012